IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| for the use and benefit of | | |
| DEBOURGH MANUFACTURING COMPANY, | * | |
| Plaintiff, | * | |
| vs. | * | CASE NO. 4:16-CV-370(CDL) |
| GSC CONSTRUCTION, INC., and | * | |
| ALLIED WORLD SPECIALTY | | |
| INSURANCE COMPANY, f/k/a Darwin | * | |
| National Assurance Company, | | |
| | * | |
| Defendants. | | |
| | * | |

O R D E R

In November 2014, the United States Army Corps of Engineers ("Army") awarded a contract for a renovation project on Fort Benning to Defendant GSC Construction ("GSC"). Pursuant to the Miller Act, 40 U.S.C. § 3131-34, GSC posted performance and payment bonds, with Defendant Allied World Specialty Insurance Company ("Allied") as surety. As part of the renovation, the Army required GSC to install storage lockers in the buildings. GSC solicited quotes from multiple subcontractors for the manufacture and installation of lockers that complied with the contract specifications. GSC submitted various locker options to the Army that GSC believed complied with the specifications. Nevertheless, the Army rejected all but the most expensive option, a storage locker with woven wire mesh manufactured by

Plaintiff Debourgh Manufacturing Company ("Debourgh"). The woven wire lockers cost $321,943.52. After completion of the project, GSC only paid Debourgh $172,494.07. Debourgh subsequently brought this action and alleged claims of breach of contract and quantum meruit. Debourgh also brought a claim on the Miller Act payment bond. Debourgh also sued for unexpected costs it allegedly incurred during installation and for an award of attorney's fees. Defendants contend that Debourgh improperly caused the Army to reject the lower-cost proposals and to insist on Debourgh's more expensive product. GSC therefore argues that Debourgh should be equitably estopped from recovery. GSC also brought a counterclaim against Debourgh for tortious interference with its contract with the Army. Debourgh filed a Motion for Partial Summary Judgment on its Miller Act claim, against GSC's counterclaim, and for the costs of the action (ECF No. 17). Because Defendants cannot establish that Debourgh's communications with the Army influenced the Army's requirement for woven wire mesh lockers, the Court grants Debourgh's motion with respect to its Miller Act claim and GSC's counterclaim. Further, because Defendants pointed to no evidence or law to the contrary, the Court concludes that Debourgh is entitled to accrued finance charges on GSC's unpaid balance. Finally, the Court denies Debourgh's motion for costs pending the outcome of Debourgh's remaining claims.

2

STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to the non-movants, the record reveals the following:

## I. Debourgh's 2013 Project

Sometime in 2013, Debourgh manufactured and installed woven wire mesh TA-50 equipment storage lockers for a different project on Fort Benning. Salo Dep. 37:13-17, ECF No. 25-2. Debourgh's point of contact with the Army for that project was First Lieutenant Aaron Boyer. GSC was not involved in the 2013 project.

## II. Buildings 2944-2945 Project

In November 2014, the Army awarded GSC a contract for the renovation of Buildings 2944 and 2945 on Fort Benning. One of the requirements of the contract was to install equipment lockers in the renovated buildings. The contract set forth some specifications for the lockers, but it did not require the use of woven wire mesh. In January 2015, GSC vice president John Phillips sent an email to Debourgh requesting a quote for lockers that complied with the specifications in the contract. Phillips attached pictures of the Debourgh lockers from the 2013 project to his email. Phillips explained that the lockers in the attached pictures were the ones that GSC needed for the 2944-2945 project. Berg Decl. Ex. A, Email from Phillips to Debourgh Sales (Jan. 30, 2015), ECF No. 17-2 at 10. In response, Debourgh sales representative Patrick Berg sent GSC a quote of $309,480.10 for the woven wire mesh lockers that matched the lockers in the picture. Berg Decl. Ex. B, Woven Wire Mesh Quote (Feb. 16, 2015), ECF No. 17-2 at 21. Berg also sent GSC a quote of $265,124.38 for expanded metal mesh lockers. Berg Decl. Ex. C, Expanded Metal Mesh Quote (Feb. 16, 2015), ECF No. 17-2 at 24.

GSC also solicited quotes from Lyon Workspaces, a competing locker manufacturer. In June 2015, GSC submitted Lyon lockers to the Army at a cost of $170,065.00. Def. Allied's Resp. Ex.

4

D, Letter from GSC to Army, ECF No. 24-4 at 13-17. In July 2015, the Army rejected this submittal. In its rejection, the Army explained to GSC that the lockers used in the 2944-2945 project "[m]ust replicate existing 3/75 Quad COF TA50 lockers exactly . . . ." Def. Allied's Resp. Ex. F, Gov't Review Remarks (July 30, 2015), ECF No. 24-6 at 1. GSC submitted another Lyon product in August 2015, which was also rejected by the Army because it "[did] not meet the owner requirements."[1] Def. Allied's Resp. Ex. F, Gov't Review Remarks (Sept. 2, 2015), ECF No. 24-6 at 2.

In September 2015, after the Army rejected the Lyon lockers, GSC submitted the Debourgh *woven wire mesh* lockers to the Army for approval. The Army accepted this proposal on September 30, 2015, giving GSC the go ahead to order the lockers. Berg Supplemental Decl. Ex. B, Army Approval for Woven

---

[1] After the Army rejected both of GSC's Lyon submittals, GSC wrote to the Army and protested that it was being forced to buy lockers from a single source. In response, the Army explained that the Lyon products were rejected because they were "not galvanized and [did] not have individual five knuckle hinges" as required by the Request for Proposals ("RFP"). Def. Allied's Resp. Ex. G, Letter from Army to GSC (Oct. 7, 2015), ECF No. 24-7. The Army further noted that "[a] quick review from our office indicates Wire Crafters, Jesco, and Standard Wire Steel, all manufacture TA-50 lockers that meet the RFP requirements." *Id*. In June 2016, GSC renewed its dispute with the Army. Def. Allied's Resp. Ex. D, Letter from GSC to Army (June 28, 2016), ECF No. 24-4. In its June 2016 letter, GSC argued that the Lyon lockers actually met the requirements of the RFP because the lockers had "continuous hinges, allowing them to be stronger[,]" and because "[e]lectro-galvanizing and galvanneal are really the same process which provides better paint adhesion and interaction with potential weather elements." *Id*. at 1. Neither party offered any evidence about the outcome of this grievance.

5

Wire Mesh Lockers, ECF No. 27-1 at 23-26. On November 6, 2015, GSC emailed Berg and placed an order for the *expanded metal mesh* lockers, not the woven wire mesh lockers that had been submitted to and approved by the Army. Berg Decl. Ex. E, Email from GSC to Berg (Nov. 6, 2015), ECF No. 17-2 at 29-31. To meet the deadline for the project, Debourgh began processing the order immediately. Berg Supplemental Decl. Ex. A, Email from Berg to GSC (Nov. 9, 2015), ECF No. 27-1 at 16-17.

**III.     Replacement Locker for the 2013 Project**

Around the same time, Berg and Lieutenant Boyer began discussing a replacement locker for the 2013 project. Sometime before August 2015, someone vandalized a locker from the 2013 project. Salo Dep. 40:10-21. On August 24, 2015, Lieutenant Boyer sent an email to Debourgh about repairing or replacing the vandalized locker. In his email, Lieutenant Boyer asked Debourgh whether it had "been able to identify a model number or a price of the wall lockers in the photos [Boyer] sent last week?" Def. Allied's Resp. Ex. B, Email from Boyer to Debourgh (Aug. 24, 2015), ECF No. 24-2 at 19. Berg replied to Boyer and said he was "working out how to get you a replacement locker . . . ." *Id.*, Email from Berg to Boyer (Aug. 24, 2015), ECF No. 24-2 at 18. Berg told Boyer that he was working with GSC on the 2944-2945 project. Berg explained that he had not yet received the purchase order for the 2944-2945 project, but that if the

6

lockers for the purchase order matched the locker that Boyer sought to replace, Berg "would be willing to just add on an additional locker" to the 2944-2945 project run to keep the cost down for Boyer. *Id*. Berg then asked if Boyer was familiar with the 2944-2945 project and whether Boyer knew who Berg could contact to learn more about the project's schedule. Berg concluded by saying "[if] I'm not able to tie these together, I can get you a separate price ASAP." *Id*.[2]

Boyer replied by giving Berg the contact information for Jennifer Mason, the project engineer for the 2944-2945 project. Berg replied that he would contact Mason about the 2944-2945 locker completion schedule. Berg also quoted Boyer prices of $1,170.65 to replace the single locker as a separate order and $462.60 to bundle the replacement locker with the prospective 2944-2945 project order. *Id*., Email from Berg to Boyer (Aug. 24, 2015), ECF No. 24-2 at 16. Boyer accepted the $462.60 option, and explained that he was waiting to hear from Mason about when the order would ship. *Id*., Email from Boyer to Berg (Sept. 1, 2015), ECF No. 24-2 at 15.

In November 2015, after Berg received the GSC purchase order for expanded metal mesh lockers, Berg followed up with Boyer. Berg explained that while Debourgh had been granted the

---

[2] Around the same time, Berg followed up with Phillips about the status of the project. Berg also informed Phillips of his correspondence with Boyer about the replacement locker. *See* Def. Allied's Resp. Ex. B, Email from Berg to Phillips (Aug. 28, 2015), ECF No. 24-2 at 4.

7

purchase order for the 2944-2945 project, the order had been "changed" and called for different lockers than the ones in Boyer's building. Therefore, Berg could not offer Boyer a discount on the replacement locker. *Id.*, Email from Berg to Boyer (Nov. 13, 2015), ECF No. 24-2 at 14. Boyer replied that he had spoken with Mason and that she was not aware of any "change" in the locker order. Instead, Boyer indicated that "[w]e would like to keep the original lockers, if possible." *Id.*, Email from Boyer to Berg (Nov. 16, 2015), ECF No. 24-2 at 13. Berg explained that the "change" was that the "[new facility] chose a locker that does not match the unite you're needing to be replaced." *Id.*, Email from Berg to Boyer (Nov. 16, 2015), ECF No. 24-2 at 13.

**IV. Change of GSC's Locker Order**

Not long after Berg sent the last email to Boyer, GSC called Berg and indicated that they might need to change their order for the 2944-2945 project. Berg Decl. ¶ 8, ECF No. 17-2. Phillips emailed Berg and explained that the Army "is expecting the woven wire lockers because those [are the lockers] we indeed actually submitted for approval some time ago . . . ." Berg Decl. Ex. H., Email from Phillips to Berg (Nov. 19, 2015), ECF No. 17-2 at 48-49. Berg advised Phillips that switching to woven wire mesh at that point would increase cost and delay delivery. Phillips then stated that if Berg could "talk to the

[Army] and backchannel this . . . it would solve a major problem!" *Id.*, Email from Phillips to Berg (Nov. 19, 2015), ECF NO. 17-2 at 46. Phillips noted that Debourgh's "[expanded] wire mesh lockers that we sent the [purchase order] for meet the spec we were given, as we showed you. Let me know if you can help us all out!" *Id.* Berg agreed that the expanded metal mesh met the Army's specifications and asked for the contact information of Phillips's "end user" with the Army. Phillips replied that the end user was "the soldier that you have talked to in the past for the Rangers. A Captain, I believe. Or maybe Lieutenant Boyer . . . ." *Id.*, Email from Phillips to Berg (Nov. 19, 2015), ECF No. 17-2 at 43. The next day, Berg replied to Phillips. Berg stated that he had talked to Boyer and that Boyer had indicated that the Army would only accept woven wire mesh lockers in the 2944-2945 project. To ensure that Debourgh could still meet the deadline, Berg immediately ordered the material needed for the woven wire mesh lockers. *Id.*, Email from Berg to Phillips (Nov. 20, 2015), ECF No. 17-2 at 42-43. Phillips later replied that "[i]f the order has been placed for the wire mesh that the [Army] wants then we are good to go . . . I will just have to sort out the timing of it, and also the increased charges for it that I will have to ask the Government to recoup me for." *Id.*, Email from Phillips to Berg (Nov. 20, 2015), ECF No. 17-2 at 40-41.

9

Debourgh ultimately delivered and installed the woven wire mesh lockers. Debourgh also supplied Boyer's replacement locker. Debourgh billed the replacement locker through a separate purchase order. Salo Dep. 37:18-23. The Army approved the 2944-2945 project lockers in February 2016. Phillips Decl. ¶ 7, ECF No. 25-6. The parties agree that the lockers cost $321,943.52. Berg Decl. Ex. M, Debourgh Invoice to GSC, ECF No. 17-2 at 71; *see also* Def. GSC's Answer & Countercl. 6, ECF No. 8 ("The Debourgh product demanded by the Army cost $321,943.52."). GSC paid Debourgh $172,494.07, or the amount that GSC would have paid Lyon had the Army accepted GSC's first submittal. Berg Decl. ¶ 14. After awaiting payment for several months, Debourgh filed this action.

## V. Debourgh's Statement of Material Facts

Allied urges the Court to strike Debourgh's Statement of Material Facts. Local Rule 56 requires summary judgment movants to file a separate statement of material facts to which the movant contends there is no genuine dispute to be tried. M.D. Ga. R. 56. "Éach material fact shall be numbered separately and shall be supported by specific citation to particular parts of materials in the record." *Id*. Debourgh's initial statement of material facts did not separately number each fact. This required Defendants to spend unnecessary time identifying each fact before replying. "[E]ven though local rules are valid and

10

binding on the parties, their enforcement must be temepered with due consideration of the circumstances." *Cohen v. Carnival Cruise Lines, Inc.* 782 F.2d 923, 924 (11th Cir. 1986) (per curiam) (footnote omitted). Here, though all the parties are corporations represented by counsel, the Court finds that the circumstances do not merit striking Debourgh's statement of material facts. Debourgh rectified its error by submitting a modified statement that incorporated Defendants' responses. The Court is satisfied with the briefing and the record that have been provided. Given the circumstances, the Court thinks it unnecessary to strike Debourgh's statement, unnecessarily prolong this action, and await a later opportunity to reach the same conclusion reached in this Order. Therefore, Allied's request to strike is denied.

DISCUSSION

Debourgh moves for summary judgment on its claim on the Miller Act payment bond for the 2944-2945 project. To establish a claim under the Miller Act, Debourgh must show "1) that materials were supplied for work in the particular contract at issue; 2) that the supplier is unpaid; 3) that the supplier had a good faith belief that the materials were for the specified work; and 4) that jurisdictional requirements are met." *U.S. ex rel. Krupp Steel Prods., Inc. v. Aetna Ins. Co.*, 831 F.2d 978, 980 (11th Cir. 1987). Defendants do not dispute that Debourgh

established these elements.  Instead, Defendants argue that Debourgh should be equitably estopped from recovery and that Debourgh is liable to GSC for tortious interference with its contract with the Army.  Because Defendants pointed to no evidence that could support these claims, the Court grants Debourgh's motion for summary judgment on its Miller Act bond, against GSC's counterclaim, and for the finance charges on GSC's unpaid balance.  The Court denies Debourgh's motion for costs pending adjudication of Debourgh's remaining claims.

I. **Defendants' Equitable Estoppel Defense**

Defendants contend that Debourgh should be equitably estopped from recovering on its Miller Act claim.  Defendants argue that "Plaintiff used it[s] relationship with the Army on previous projects to get the Army to reject every other locker presented, besides Plaintiff's most expensive quote.  But for Plaintiff's interference in this project by its communications directed to the Army behind the scenes and without GSC's knowledge, GSC would have spent only $170,000 on lockers for the project . . . ."  Def. Allied's Resp. 13, ECF No. 26; *see also* Def. GSC's Resp. 6-7, ECF No. 25 (making the same argument).  The record evidence, however, does not support this theory.  The Army rejected GSC's first Lyon locker submittal on July 30, 2015 and explained to GSC that the lockers in the 2944-2945 project "must match existing 3/75 Quad COF TA50 lockers exactly."  Def.

Allied's Resp. Ex. F, Gov't Review Remarks (July 30, 2015), ECF No. 24-6. Therefore, the Army expressed its requirement for woven wire mesh lockers as early as July 30, 2015.[3] There is no evidence, however, that Debourgh had any contact with the Army until almost a month later on August 24, 2015, when Berg replied to Boyer's email. Therefore, there is no evidence that Debourgh used its pre-existing relationship with the Army to "get the Army to reject every other locker presented." Def. GSC's Resp. 7. Instead, the evidence demonstrates that the Army required woven wire mesh lockers at least one month before Debourgh communicated with the Army (and then, it was in response to Boyer's question about replacing the vandalized locker). Consequently, there is no genuine dispute about whether Debourgh improperly influenced the Army. Defendants make no other arguments contesting Debourgh's Miller Act bond claim. Therefore, the Court grants summary judgment in favor of Debourgh on its Miller Act claim.[4]

---

[3] In fact, the requirement for woven wire mesh lockers may have been in place even earlier. In his initial email to Debourgh in January 2015, Phillips attached a picture of the Debourgh lockers from the 2013 project and explained that "[t]he attached photos show the locker we need." Berg Decl. Ex. A, Email from Phillips to Debourgh Sales (Jan. 30, 2015), ECF No. 17-2 at 10. Phillips's email suggests that GSC knew from the outset that the Army required woven wire mesh lockers, further undermining Defendants' assertion that Debourgh "manipulated the Army to modify the project's specifications for its benefit." Def. GSC's Resp. 4.

[4] Debourgh also urges the Court to strike portions of Phillips's declaration. Pl.'s Reply 6, ECF No. 27. Even if these paragraphs are

13

## II. Defendants' Tortious Interference Counterclaim

GSC brought a counterclaim against Debourgh for "tortious interference with contracts." Def. GSC's Answer & Countercl. 7, ECF No. 8. To establish this claim, GSC must show that Debourgh "(1) acted improperly or wrongfully and without privilege; (2) acted purposely, with malice, and with the intent to injure; (3) induced a third party to breach a contract with the plaintiff; and (4) caused plaintiff financial injury." *Shiho Seki v. Groupon, Inc.*, 333 Ga.App. 319, 323, 775 S.E.2d 776, 780 (Ga. Ct. App. 2015) (quoting *Medlin v. Morganstern*, 601 S.E.2d 359, 361-62 (Ga. Ct. App. 2004)). Debourgh also moved for summary judgment on this claim. In its response, GSC made no arguments and pointed to no evidence in support of its counterclaim. Because the Army required the use of woven wire mesh lockers before any contact between the Army and Debourgh, GSC cannot show that Debourgh induced the Army to breach its contract with GSC. Thus, GSC cannot establish the third element of its counterclaim. Therefore, the Court grants summary judgment in favor of Debourgh on GSC's counterclaim.[5]

---

admissible, the Court concludes that they do not create a genuine fact dispute. Therefore, Debourgh's motion to strike is denied as moot.

[5] The Court further notes that neither GSC nor Allied made any arguments in favor of GSC's counterclaim in their responses. Defendants did not identify the elements of their counterclaim or point to any evidence that could support those elements. Therefore, the Court deems GSC's counterclaim abandoned. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc).

14

**III. Debourgh's Finance Charges**

Debourgh also contends that it should recover the accrued finance charges on GSC's unpaid balance. Debourgh's original invoice to GSC clearly stated that "[i]nvoices over 90 days past due are subject to finance charges of 1-1/2% per month." Berg Decl. Ex. M, Invoice from Debourgh to GSC, ECF No. 17-2 at 71. In its motion, Debourgh clearly sought summary judgment on the accrued finance charges. Defendants, however, pointed the Court to no evidence disputing the accrued finance charges and to no law suggesting that the finance charges are not recoverable. Therefore, based on the circumstances and the record of this case, the Court concludes that the accrued finance charges are also recoverable.

Based on the evidence, the accrued finance charges when the Complaint was filed totaled $15,066.50. Berg Decl. Ex. N., GSC Invoices for Finance Charges, ECF No. 17-2 at 74-79. Therefore, when Debourgh filed its Complaint, GSC owed Debourgh $164,511.95 ($149,445.45 in unpaid principal and $15,066.50 in finance charges). This amount is subject to the 1.5% finance charge each month from November 2016 to October 2017 (12 compounding periods). A principal of $164,511.95 compounded monthly at 1.5% for 12 months yields $32,181.53 in additional interest. Therefore, Defendants are liable to Debourgh in the amount of $196,693.48. In lieu of any additional court-ordered post-

judgment interest, Debourgh's finance charge of 1.5% shall continue to apply until Defendants satisfy the judgment.

**IV. Debourgh's Remaining Claims**

Debourgh additionally urges the Court to award it "all costs of this action." Pl.'s Mot. for Partial Summ. J. 3. In its Complaint, however, Debourgh also alleged state law claims of breach of contract and quantum meruit. Pl.'s Compl., Counts 1 & 2, ECF No. 1. Debourgh also alleged that GSC is responsible for $13,285 for additional costs Debourgh incurred "due to interference with its work by others." Berg Decl. ¶ 15; *see also* Berg Decl. Ex. P, Email from Berg to Phillips (Apr. 13, 2016), ECF No. 17-2 at 83-84 (outlining the alleged additional costs Debourgh incurred). Debourgh also made a claim for attorney's fees. Compl. ¶¶ 12, 17. Neither party moved for summary judgment on any of these remaining claims. The Court therefore denies Debourgh's motion for costs pending disposition of the remaining claims.

CONCLUSION

For the foregoing reasons, Debourgh's Motion for Partial Summary Judgment (ECF No. 17) is granted in part and denied in part. The Court enters judgment in favor of Debourgh on its Miller Act bond claim in the amount of $196,693.48. GSC and Allied, as principal and surety, are jointly and severally liable for this amount. The monthly finance charge of 1.5%

shall continue to apply.  No other court-ordered post-judgment interest shall accrue.

IT IS SO ORDERED, this 16th day of November, 2017.

S/Clay D. Land  
CLAY D. LAND  
CHIEF U.S. DISTRICT COURT JUDGE  
MIDDLE DISTRICT OF GEORGIA